# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| IN RE: ) | CHAPTER    11 |
| ) | |
| CLINTON NURSERIES, INC.; CLINTON ) | CASE No.    17-31897 (JJT) |
| NURSERIES OF MARYLAND, INC.; ) | CASE No.    17-31898 (JJT) |
| CLINTON NURSERIES OF FLORIDA, ) | CASE No.    17-31899 (JJT) |
| INC.; and TRIEM LLC, ) | CASE No.    17-31900 (JJT) |
| DEBTORS. ) | (Jointly Administered under Case No. |
| ) | 17-31897 (JJT)) |
| CLINTON NURSERIES, INC.; CLINTON ) | |
| NURSERIES OF MARYLAND, INC.; ) | RE: ECF Nos. 672, 725, 726, 743, 773 |
| CLINTON NURSERIES OF FLORIDA, ) | |
| INC.; and TRIEM LLC, ) | |
| ) | |
| PLAINTIFFS ) | |
| V. ) | |
| ) | |
| WILLIAM K. HARRINGTON, ) | |
| UNITED STATES TRUSTEE, REGION 2, ) | |
| ) | |
| DEFENDANT. ) | |
| ) | |

## **APPEARANCES**

Eric A. Henzy, Esq.                                   Attorney for the Movants/Plaintiffs
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Robert J. Schneider, Jr., Esq.                      Attorneys for the Respondent/Defendant
Kim L. McCabe, Esq.
Steven E. Mackey, Esq.
Department of Justice
Office of the United States Trustee, Region 3
One Newark Center
1085 Raymond Boulevard, Suite 2100
Newark, NJ 07102

**RULING AND ORDER CONVERTING
CONTESTED MOTION TO ADVERSARY PROCEEDING AND
MEMORANDUM OF DECISION DISMISSING ADVERSARY PROCEEDING
FOR FAILURE TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED**

I.      INTRODUCTION

In his famous *Lochner* dissent, Justice Holmes wrote:

> This case is decided upon an economic theory which a large part of the country
> does not entertain. If it were a question whether I agreed with that theory, I should
> desire to study it further and long before making up my mind. But I do not conceive
> that to be my duty, because I strongly believe that my agreement or disagreement
> has nothing to do with the right of a majority to embody their opinions in law. . . .
> Some . . . laws embody          convictions or prejudices which judges are likely to
> share. Some may not. But a Constitution is not intended to embody a particular
> economic theory . . . . It is made for people of fundamentally differing views, and
> the accident of our finding certain opinions natural and familiar, or novel, and even
> shocking ought not to conclude our judgment upon the question whether statutes
> embodying them conflict with the Constitution of the United States.

*Lochner v. New York*, 198 U.S. 45, 75–76 (1905) (Holmes, J., dissenting).[1] Although those

words concerned a different law passed in a different era that was struck down under a different

part of the Constitution, they are apt here.

The related debtors, Clinton Nurseries, Inc.; Clinton Nurseries of Maryland, Inc.; Clinton

Nurseries of Florida, Inc.; and Triem LLC (collectively, "Debtors") filed a Motion to Determine

Amount of United States Trustee Fees Pursuant to 28 U.S.C. § 1930(a)(6) ("Motion," ECF No.

672), making two principal arguments: (1) that the 2017 amendments to 28 U.S.C. § 1930(a)(6),

made through the Bankruptcy Judgeship Act of 2017, Pub. L. 115-72, Div. B, § 1004(a); 131

Stat. 1232 ("2017 Amendments"), created non-uniform bankruptcy law, in violation of Article 1,

Section 8, Clause 4 of the United States Constitution ("Bankruptcy Clause"), and (2) that the

---

[1] Privately, Justice Holmes wrote to a friend that he and his fellow justices were loath to strike down a particular statute "unless it makes us puke." Letter from Justice Oliver Wendell Holmes to Harold J. Laski (Oct. 23, 1926), *in* 2 Holmes–Laski Letters: The Correspondence of Mr. Justice Holmes and Harold J. Laski 888 (Mark DeWolfe Howe ed., 1953).

2017 Amendments transformed the Debtors' Chapter 11 quarterly fees into an unconstitutional user fee.

The United States Trustee for Region 2, William K. Harrington ("UST"), filed two objections, one procedural ("Procedural Objection," ECF No. 725) and one substantive ("Substantive Objection," ECF No. 726). In the Procedural Objection, the UST argues that the claims raised in the Motion must be brought in an adversary proceeding, and so the Motion should be denied. In the Substantive Objection, the UST argues that the 2017 Amendments do not violate either the Bankruptcy Clause or the Fifth Amendment to the United States Constitution.

The Court has studied the Motion, the Objections, and the parties' reply briefs ("Reply," ECF No. 743; "Sur-Reply," ECF No. 773). After a scrupulous review of the statute in question, along with governing precedent, and the record of the hearing, the Court determines that: (1) Triem LLC, as alleged, has no standing to pursue these matters; (2) the Court will convert the Motion to an Adversary Proceeding and treat the UST's Substantive Objection as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure; (3) the 2017 Amendments do not violate the Bankruptcy Clause and are otherwise being faithfully executed by the UST; and (4) the Debtors' allegations, as pleaded, are insufficient to establish a takings claim under the Fifth Amendment. The Court, therefore, DISMISSES the Adversary Proceeding upon the terms further stated within the Discussion.

II.     JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b)[2] and derives its authority to hear and determine this matter on reference from the District Court pursuant to 28

---

[2] Section 1334(b) grants the district court original jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11." This grant of jurisdiction is made "notwithstanding any Act of

U.S.C. § 157(a) and (b)(1). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

III.   DISCUSSION

A.   Triem LLC Does Not Have Standing; Clinton Nurseries of Maryland, Inc., Has Limited Standing; No Debtor Has Standing Concerning 2019 Fees

The Court must first address the threshold issue of standing. Among other things,

standing requires that a party seeking relief have an "injury in fact" that is "concrete and

particularized[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal

quotation marks omitted). While pointing out that the Debtors combined pay substantially

increased fees, the Debtors' allegations in the Motion make clear that not every Debtor was

affected every quarter. As alleged, Triem LLC paid the exact same fees in each quarter of 2018

as it would have paid under the prior version of 28 U.S.C. § 1930(a)(6). Clinton Nurseries of

Maryland, Inc., meanwhile, was only affected by the 2017 Amendments in two of the four

quarters. And, although the Debtors posit that their 2019 quarterly fees would be similar, the

Debtors have not supplemented their pleadings to include what harm, if any, the Debtors have

thus far experienced in 2019.[3]

---

Congress that confers exclusive jurisdiction on a court or courts other than the district courts[.]" *Id.* The Court finds this statute sufficient to allow the Court to address the Debtors' user fee claims, which under 28 U.S.C. §§ 1346 and 1491 would, outside of bankruptcy, need to be addressed in the Court of Federal Claims, at least in part. *See Plum Run Serv. Corp. v. U.S. Dept. of Navy (In re Plum Run Serv. Corp.)*, 167 B.R. 460, 464–65 (Bankr. S.D. Ohio 1994). In considering whether this Court should abstain from hearing the matter under 28 U.S.C. § 1334(c)(1), *see Marah Wood Prods., LLC v. Jones*, 534 B.R. 465, 477–79 (D. Conn. 2015), this Court will not do so because of the predominance of bankruptcy issues in determining whether the user fee is a taking, not some specialized knowledge exclusively within the expertise of the Court of Federal Claims, which does not have exclusive jurisdiction over all takings claims.

[3] In a joint scheduling order laying out the briefing schedule on this matter, the Debtors and the UST agreed that the UST would not compel the payment of quarterly fees during the pendency of this matter (ECF No. 681), which the Debtors note in their proposed Chapter 11 plan of reorganization (ECF No. 718). Because the Debtors have not identified those fees in any regard, the Court need not surmise whether the Debtors' claims regarding the 2019 fees are ripe.

The Debtors' prayer for relief in the Motion seeks "an order determining that US Trustee fees payable by the Debtors in these cases will be calculated based on the pre-amendment 28 U.S.C. § 1930(a)(6) fee schedule[.]" Implicit in this request is a concession that the Debtors would not consider themselves harmed by the former fee schedule. Therefore, the Court finds that the Debtors only have standing to challenge those fees that they allege are different from those they would have paid under the former fee schedule, which means that Triem LLC does not have standing to pursue this Motion,[4] Clinton Nurseries of Maryland, Inc., only has standing to challenge the second and third quarters of 2018, and no debtor has standing to challenge its 2019 fees under the facts alleged.

B.      The Court Converts This Matter to an Adversary Proceeding

The Court next addresses the UST's Procedural Objection, which also poses threshold issues, but, as will be discussed, not jurisdictional issues. The UST argues that under Federal Rule of Bankruptcy Procedure ("FRBP") 7001, the Debtors can only seek relief in an Adversary Proceeding. The Debtors maintain that FRBP 3012, rather than FRBP 7001, governs the issues and that, even if this matter should have been filed as an Adversary Proceeding, the UST has not been prejudiced, the Court could apply Part VII rules, or the Court could convert the matter to an Adversary Proceeding. The Court agrees with the UST that the issues raised in the Motion require an Adversary Proceeding, but the Court uses its powers under 11 U.S.C. § 105(a) to *sua sponte* convert the matter to an Adversary Proceeding.

---

[4] From this point forward in this Memorandum, "Debtors" will only refer to Clinton Nurseries, Inc.; Clinton Nurseries of Maryland, Inc.; and Clinton Nurseries of Florida, Inc.

1.    *FRBP 7001 Applies to This Matter*

The parties principally disagree about which FRBP has been invoked by the issues raised in the Motion.[5] The UST argues that FRBP 7001 applies because the Debtors seek "to determine the validity . . . [of an] interest in property" and seek "to obtain a declaratory judgment relating to any of the foregoing[.]" Fed. R. Bankr. P. 7001(2) and (9). The UST also argues that FRBP 2020[6] does not apply because the Debtors are not challenging the UST's actions, but an act of Congress. Even if FRBP 2020 applies, the UST argues that FRBP 9014 itself requires the Debtors to seek relief through an Adversary Proceeding. The Debtors, meanwhile, assert that under FRBP 3012, the amount of a priority claim is determined as a contested matter and that the Debtors are challenging the UST's actions, through FRBP 2020, in issuing invoices seeking payment of quarterly fees. The Court agrees with the UST.

The UST is correct that the Debtors seek "to determine the validity . . . [of an] interest in property," Fed. R. Bankr. P. 7001(2), namely, money that is otherwise property of the Debtors' estates. FRBP 7001(2) does exempt from its definition "proceeding[s] under Rule 3012." FRBP 3012 states, in relevant part, that "the court may determine . . . the amount of a claim entitled to priority under § 507 of the Code[,]" and that such "may be made by motion[.]" Fed. R. Bankr. P. 3012. The advisory committee notes make clear, however, that "[a]n adversary proceeding is commenced when the validity, priority, or extent of a lien is at issue as prescribed by Rule 7001.

---

[5] As a preliminary matter, the Court notes that the Debtors stated that they would withdraw their request for a refund of fees already paid during a status conference on the Motion (ECF No. 796), which the Debtors stated they would pursue pending the outcome of these proceedings. This proposed withdrawal, reiterated at the hearing, would obviate the UST's concern about the applicability of FRBP 7001(1), but, given the Court's decision to convert the matter to an Adversary Proceeding, the Court will allow the Debtors to reassert their request for such relief in an amended complaint.

[6] FRBP 2020 provides that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014[,]" referring to the rule on contested matters.

That proceeding is relevant to the basis of the lien itself" while FRBP 3012 is meant for valuation purposes.[7] *Id.*

The Debtors here do not merely seek to value what is owed to the UST. Their allegations make clear that they know how much they would owe for 2018 under the current and former versions of 28 U.S.C. § 1930(a)(6). Instead, the Debtors seek a determination that any amount paid beyond what the former fee schedule prescribed is invalid. Such must be sought in an Adversary Proceeding. *See* Fed. R. Bankr. P. 7001(9).

FRBP 2020 is also inapplicable to this matter. Although the Rule applies to "proceeding[s] to contest any act or failure to act by the [UST,]" according to the advisory committee notes, it "does not provide for advisory opinions in advance of the act." Fed. R. Bankr. P. 2020. Because the Debtors seek determinations both for the fees already assessed and those to be assessed in the future, FRBP 2020 does not help the Debtors.[8]

2.    *The Court Can Convert the Motion to an Adversary Proceeding*

Having determined that FRBP 2020 and FRBP 3012 do not apply to this matter, the Court is left with only FRBP 7001. That, however, does not mean that the Court must deny the Motion and have the Debtors start over by filing an Adversary Proceeding. As the Debtors noted, this Court may convert the matter to an Adversary Proceeding. Unlike other cases where this Court has ordered that the Debtor file an Adversary Proceeding, the parties in this matter have fully briefed what they both consider, at this point at least, purely legal issues. In the interests of efficiency and judicial economy, the Court finds that the parties have had their full and fair

---

[7] The Court acknowledges that the advisory committee notes reference "lien[s]" but not "other interest[s] in property"; however, the logic behind the note extends equally to "other interest[s] in property."

[8] The Court understands the contradiction in this statement, considering the Court has already held that the Debtors do not have standing to challenge those fees that were not detailed in the Motion; however, were the Court to rule in the Debtors' favor on the uniformity challenge, such would, as a matter of preclusion, preemptively decide any future challenge by the Debtors to any UST actions regarding quarterly fees, as well.

opportunity to address the merits of these issues,[9] so denying the Motion and forcing the Debtors

to start over and file an Adversary Proceeding would severely elevate form over substance.[10]

Instead of doing that, the Court will instead exercise its prerogative to *sua sponte* convert

the contested matter to an Adversary Proceeding. The Bankruptcy Code allows this Court "to

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of" the Bankruptcy Code. 11 U.S.C. § 105(a). This power is broad enough to permit a court to

"convert a contested matter to an adversary proceeding on its own motion." *Wilborn v. Wells*

*Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 872, 892 (Bankr. S.D. Tex. 2009) (citing *Costa v.*

*Marotta, Gund, Budd & Dzera, LLC*, 281 F. App'x 5, 6 (1st Cir. 2008) (per curiam); *Johnson v.*

*Stemple (In re Stemple)*, 361 B.R. 778, 784 (Bankr. E.D. Va. 2007)). Accordingly, the Court

OVERRULES the Procedural Objection and CONVERTS this matter to an Adversary

Proceeding.

3.      *The Court Treats the Substantive Objection as a Motion to Dismiss*

This procedure of converting a contested matter to an Adversary Proceeding was used in

the face of this precise argument made by the UST in *In re Circuit City Stores, Inc.*, No. 08-

35653, 2019 WL 3202203, at *3–4 (Bankr. E.D. Va. July 15, 2019), and this Court readily

acknowledges using the same authorities and logic to convert this matter as well. The *Circuit*

---

[9] After filing the Motion, the Debtors, jointly with the UST, agreed to allow the UST 61 days to file an objection (ECF No. 681), which exceeds the amount of time the UST would have had to answer an adversary complaint by *26 days*. Fed. R. Bankr. P. 7012(a). And yet, the UST did not file the Procedural Objection until the very last day available. This particular circumstance, coupled with the UST not having claimed or demonstrated any prejudice here, leads this Court to conclude that converting the Motion to an Adversary Proceeding without denying the Motion is the better course than forcing the Debtors—who *would* be prejudiced by such—to file an Adversary Proceeding from scratch.

[10] Regardless of whether the Court maintains this matter as a contested matter or converts it to an Adversary Proceeding, the Court is not deprived of jurisdiction, even if—as the UST claims—such were error. *See Hamer v. Neighborhood Hous. Servs.*, 138 S. Ct. 13, 17–18 (2017) ("Only Congress may determine a lower federal court's subject-matter jurisdiction[,]" and "mandatory claim-processing rules [not prescribed by Congress] must be enforced, *but they may be waived or forfeited*." [emphasis added; citations and internal quotation marks omitted]).

*City* court decided that because "there were no material facts in dispute and that the matters raised in the pleadings were purely dispositive questions of law, the Court entertained the pleadings as cross-motions for summary judgment under Bankruptcy Rule 7056 and proceeded thereon." *Id.* at *4 n.19.

This Court is wary of proceeding under FRBP 7056. Although the parties do not seem to have any factual disputes at this point, this Court, unlike the *Circuit City* court, is faced with the argument that the Debtors' quarterly fees are takings, violating the Fifth Amendment. That claim, for reasons discussed in part III.D of this Memorandum, is ordinarily a fact-intensive exercise, and the Debtors have requested that the Court rule first on the legal cognizability of the claim before any discovery on it proceeds. Therefore, the Court will instead entertain the Debtors' Motion as a complaint; the UST's Substantive Objection as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as applied by FRBP 7012; the Debtors' Reply as an objection to the motion to dismiss; and the UST's Sur-Reply as a reply to the objection. To avoid confusion, the Court will continue to refer to the pleadings as they have been labeled by the parties, as already abbreviated by the Court (i.e., the Court will still refer to the Debtors' complaint as the "Motion," the UST's motion to dismiss as the "Substantive Objection," etc.). From this point forward in the Memorandum, the Court has not considered any attachment to any pleading to the extent that any would be considered evidence unless pleaded by the Debtors. Further, the Court has not considered any factual allegation by the UST that contradicts or supplements the allegations made in the Debtors' Motion.

The Court turns to the following applicable legal standard.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Case 17-31897   Doc 835   Filed 08/28/19   Entered 08/28/19 11:12:57   Page 11 of 38

*Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citation omitted). Having reached this point, the Court finally considers the merits.[11]

    C.    The 2017 Amendments Do Not Violate the Bankruptcy Clause

Article I, Section 8, Clause 4 of the United States Constitution vests Congress with the power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States[.]" "To this specific grant, there must be added the powers of the general grant of clause eighteen. 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . [.]'" *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938). "The laws passed on the subject [of bankruptcy] must, however, be uniform throughout the United States, but that uniformity is geographical and not personal[.]" *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902). "The uniformity requirement is not a straitjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner. A bankruptcy law may be uniform and yet may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different States." *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982) (citation and internal quotation marks omitted). In certain circumstances, Congress may "take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Id.* (citation and internal quotation marks omitted). "To survive scrutiny under the Bankruptcy Clause, a law

---

[11] In considering the Motion as a complaint, the Court assumes the parties' familiarity with the factual and legal allegations within it and will address pertinent facts as necessary. That consideration requires construing the Debtors' arguments as liberally as possible, but within the confines of the two counts alleged; however, it also requires the Court to consider the iceberg of precedent below the arguments and authorities discussed by the UST. These issues are serious, and the Court cannot decide the constitutionality of a statute only based on what has been expressed.

must at least apply uniformly to a defined class of debtors." *Id.* at 473. Thus, if a bankruptcy law applies with geographic uniformity to a particular class of debtors, it will pass muster.

The UST Program, a division of the Department of Justice, was established as a pilot program in conjunction with the adoption of the Bankruptcy Code in 1978. *See* Pub. L. 95-598, Title II, § 224(a), 92 Stat. 2662. The program became permanent in 1986 and now serves every district except those in Alabama and North Carolina. *See* Pub. L. 99-554, Title I, § 111(a)–(c), 100 Stat. 3090, 3091. The six districts in those two states are served by Bankruptcy Administrators ("BAs"), who operate under the purview of the Judicial Branch. The duties of BAs, in essence, match those of USTs.

Under 28 U.S.C. § 1930(a)(6), debtors in Chapter 11 cases are responsible for paying quarterly fees, the amount of which depends upon a number of factors. Initially, Chapter 11 debtors in BA districts did not have to pay any quarterly fees. In 1994, the Ninth Circuit, in *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1531 (9th Cir. 1994), *as amended by* 46 F.3d 969 (9th Cir. 1995), found this arrangement unconstitutional because Congress "provided no indication that the exemption [from the fees] in question was intended to deal with a problem specific to North Carolina and Alabama[.]" The Ninth Circuit, however, refused to find the dual system of USTs and BAs unconstitutional on its own, *id.* at 1532–33, and that dual system has persisted to this day.[12]

In response to *Victoria Farms*, the Judicial Conference asked Congress for permission to charge fees in BA districts "comparable" to those in UST districts. Report of the Proceedings of the Judicial Conference of the United States 10 (Mar. 1996). In 2000, Congress added subsection (7) to 28 U.S.C. § 1930(a). Pub. L. 106-518, Title I, § 105, 114 Stat. 2411. Shortly thereafter, the

---

[12] The Debtors have not claimed that the dual system of USTs and BAs is unconstitutional.

Judicial Conference began imposing quarterly fees in BA districts "in the amounts specified" in 28 U.S.C. § 1930(a)(6). Report of the Proceedings of the Judicial Conference of the United States 45–46 (Sept./Oct. 2001). In 2017, Congress amended 28 U.S.C. § 1930(a)(6), increasing quarterly fees, ostensibly to provide more money to the UST Program, which is self-funded, and to endow additional bankruptcy judgeships.[13] Bankruptcy Judgeship Act of 2017, Pub. L. 115-72, Div. B, § 1004(a), 131 Stat. 1232. Beginning January 1, 2018, quarterly fees increased in all Chapter 11 cases in all UST districts, whether new or pending; however, the Judicial Conference did not immediately implement the fee increase in BA districts. Instead, the Judicial Conference adopted those fees beginning October 1, 2018, and only in cases filed on or after that date. Report of the Proceedings of the Judicial Conference of the United States 11–12 (Sept./Oct. 2018).[14]

The constitutionality of the 2017 Amendments was first addressed in *In re Buffets, LLC*, 597 B.R. 588 (Bankr. W.D. Tex. 2019), *appeal docketed*, No. 19-90020 (5th Cir. Aug. 16, 2019). In *Buffets*, the court held that the Judicial Conference's late implementation of quarterly fee increases under 28 U.S.C. § 1930(a)(6) and (7) meant that:

> The Bankruptcy Judgeship Act of 2017 violated the Constitution when it increased quarterly fees only in the UST program. "Under any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary." [*Victoria Farms*], 38 F.3d at 1532. While the quarterly fees now apply in BA districts from October 1, 2018, forward, the increased fees ostensibly owed by the Reorganized Debtors during the first three quarters of 2018 violate the Uniformity Clause.

---

[13] Prior to the 2017 Amendments, 100% of the quarterly fees collected were deposited into the UST System Fund. Currently, 2% of quarterly fees are deposited into the general treasury fund to fund additional bankruptcy judgeships. *See* Pub. L. 115-72, Div. B, § 1004(b); 131 Stat. 1232; *see also* H.R. Rep. No. 115-130, at 8, *reprinted in* 2017 U.S.C.C.A.N. 154, 160.

[14] The Judicial Conference Committee on the Administration of the Bankruptcy System noted issues with quarterly fees generally, expressing concern that they chill large Chapter 11 case filings and preclude large Chapter 11 debtors from reorganizing successfully and that increased fees would exacerbate those problems. Report of the Judicial Conference Committee on the Administration of the Bankruptcy System 19–20 (Sept. 2018). Nevertheless, the Committee recommended that the Judicial Conference adopt the increased fees. *Id.*

*Id.* at 595.[15] The Court then determined that the debtors in that case were "not required to pay the $250,000 in fees for the first three quarters of 2018, but rather the uniform quarterly fee of $30,000." *Id.* at 596.[16]

More recently, the aforementioned *Circuit City* court adopted the *Buffets* rationale when it held the 2017 Amendments unconstitutional. 2019 WL 3202203, at *6–7.[17] The court there noted that for the first three quarters of 2018, "increased quarterly fees [were] assessed against chapter 11 debtors in only 88 of the 94 federal judicial districts throughout the country. It was not until October 1, 2018, that the [Judicial Conference] approved the imposition of quarterly fees on chapter 11 debtors in the BA Districts 'in the amounts specified in 28 U.S.C. § 1930(a)(6)(B).' . . . The Bankruptcy Judgeship Act offered no justification for excluding the BA Districts from the fee step-up." *Id.* at *6 (citation omitted). The court also observed that debtors with cases pending when the fee increases went into effect in UST districts are charged the increased fees, but those in BA districts are not. *Id.* "As the BA Districts do not apply section 1930(a)(6)(B)'s fee increase to pending cases, the fee increase cannot constitutionally be applied

---

[15] The court noted that the Judicial Conference's "decision to apply the fees to BA districts remedies the amendment's violation of the Uniformity Clause for future cases, but not in this case. Like the lack of uniformity that originally existed between the two programs, the gap in time between the imposition of the quarterly fees in UST districts and BA districts is problematic." 597 B.R. at 594–95.

[16] The *Buffets* court also considered the meaning of "disbursements" under 28 U.S.C. § 1930(a)(6) and the argument that the 2017 Amendments should not apply retroactively due to the "presumption against retroactively applying statutes." 597 B.R. at 593–97. The Debtors have not raised the disbursements issue or independently claimed that the 2017 Amendments should not apply to them because of the presumption against retroactivity, only arguing in the Motion that "the only way fee increases can be *applied uniformly* to all cases is to only apply [them] to cases filed on or after October 1, 2018." (emphasis added). Because the Debtors have not explicitly asked this Court to consider retroactivity outside of the uniformity question, the Court cannot do so.

Additionally, the *Buffets* court noted that the debtors there raised a claim that "the user-fees are grossly disproportionate to the services that the UST provides to the Debtors[,]" 597 B.R. at 592, but, apparently in light of its decisions on uniformity and retroactivity, did not decide the user fee issue.

[17] The *Circuit City* court also considered the retroactivity question from *Buffets* and whether the 2017 Amendments are a non-uniform tax. 2019 WL 3202203, at *4–7. The tax issue has also not been raised in this matter.

to pending cases outside of the BA Districts. The Court holds that section 1930(a)(6)(B) remains unconstitutionally non-uniform *as applied* to pending cases." *Id.* at *7 (emphasis added). The court further held that "[a]s the amendment to section 1930(a)(6) does not apply uniformly both to chapter 11 debtors with pending cases in BA districts and to chapter 11 debtors with pending cases in U.S. Trustee districts, it is unconstitutional under the Bankruptcy Clause." *Id.* The court, similar to *Buffets* then determined that the debtor's fees must be based on the prior version of the statute.[18] In an opinion issued just last week, the Bankruptcy Court for the Northern District of Texas adopted the rationale of both *Buffets* and *Circuit City* on this particular issue. *In re Life Partners Holdings, Inc.*, No. 15-40289, 2019 WL 3987707, at *3–4, *7 (Bankr. N.D. Tex. Aug. 22, 2019).[19]

The Debtors here filed their cases in 2017. As Connecticut is served by the UST, the Debtors have been paying higher fees than they would have paid in BA districts, not only for the three quarters between the respective dates of implementation in UST and BA districts, but also because the BA districts have only applied the fees to debtors whose cases were filed on or after October 1, 2018. The Debtors, therefore, claim that this double non-congruence creates non-uniform bankruptcy law as each pertains to fees. The UST, on the other hand, argues that the non-uniformity stems only from the implementation of a law that is uniform on its face. The Court readily acknowledges that nothing distinguishes the Debtors here from the debtors in *Buffets*, *Circuit City*, or *Life Partners* on this issue. Nevertheless, the Court agrees with the UST.

---

[18] The Seventh Circuit was also recently asked to weigh in on the uniformity and user fee issues concerning the 2017 Amendments but declined to do so because the issues were not raised until appeal. *Cranberry Growers Coop. v. Layng (In re Cranberry Growers Coop.)*, 930 F.3d 844, 853–57 (7th Cir. 2019). The only issue decided at the bankruptcy court was the meaning of the term "disbursements" in 28 U.S.C. § 1930(a)(6), *id.* at *1–4, which was also considered in *Buffets*. *See* footnote 16 of this Memorandum.

[19] The *Life Partners* court also addressed the retroactivity issue and likewise adopted the reasoning of the *Buffets* and *Circuit City* courts.

1.    *28 U.S.C. § 1930 is a Bankruptcy Law Subject to the Bankruptcy Clause*

As a threshold matter to determining whether the 2017 Amendments to 28 U.S.C.

§ 1930(a)(6), as construed and applied by subsection (7), created non-uniform bankruptcy law,

the Court must address the UST's argument that 28 U.S.C. § 1930(a)(6) and (7) are not laws "on

the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. The UST cites *Gibbons* for the

proposition that "bankruptcy" is the "subject of the relations between [a] . . . debtor and his

creditors, extending to his and their relief." *Gibbons*, 455 U.S. at 466 (citations and internal

quotation marks omitted). The UST argues that this narrow definition of bankruptcy does not

encapsulate Chapter 11 quarterly fees because such "is merely a funding mechanism for the

efficient administration of bankruptcy matters . . . ; it does not alter substantive bankruptcy law."

The UST also quotes a Third Circuit decision, which, agreeing with the UST there, stated that

"Congress's mandate requiring payment of post-confirmation quarterly fees is not an effort to

alter the terms of pre-existing debts; rather it creates a new expense that did not exist before the

plan was confirmed." *U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 (3d Cir.

1999) (internal quotation marks omitted).

The UST's argument is wholly without merit. The Supreme Court has not defined

bankruptcy so narrowly. *Gibbons* does indeed say that bankruptcy is the "subject of the relations

between an insolvent or nonpaying or fraudulent debtor and his creditors extending to his and

their relief[,]" but *in the very same sentence*, which the UST omits, states that "[t]he subject of

bankruptcies is incapable of final definition[.]" *Gibbons*, 455 U.S. at 466 (citations and internal

quotation marks omitted). Additionally, although the UST states that this quote from *Gibbons* is

sourced from *Moyses*, the quote actually is from *Wright*. In *Wright*, the Supreme Court further

elaborated:

> The subject of bankruptcies is incapable of final definition. The concept changes. It has been recognized that it is not limited to the connotation of the phrase in England or the States, at the time of the formulation of the Constitution. An adjudication in bankruptcy is not essential to the jurisdiction. The subject of bankruptcies is nothing less than "the subject of the relations between an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his and their relief."

304 U.S. at 513–14 (citations and footnotes omitted). That passage does not quote *Moyses*, as the UST states, but *In re Reiman*, 20 F. Cas. 490, 497 (S.D.N.Y. 1874) (No. 11,673),[20] although *Moyses* does cite to *Reiman* approvingly without any exposition of it. 186 U.S. at 187. *Moyses* also cites *In re Klein*, 42 U.S. (1 How.) 277, 14 F. Cas. 716 (C.C.D. Mo. 1843) (No. 7,865), an opinion from the Circuit Court for the District of Missouri that was written by Justice Caton riding circuit.[21] 186 U.S. at 186. *Klein* states that Congress's bankruptcy jurisdiction "extends to all cases where the law causes to be distributed, the property of the debtor among his creditors; *this is its least limit*." 42 U.S. (1 How.) at 281, 14 F. Cas. at 718 (emphasis added). *Moyses* quotes this line verbatim. 186 U.S. at 186.

What is evident, then, is that the Bankruptcy Clause does pertain to the debtor–creditor relationship, but at *the very least*. The Supreme Court has also said that "as [Congress] is authorized 'to establish uniform laws on the subject of bankruptcies throughout the United States,' it may embrace within its legislation *whatever may be deemed important to a complete and effective bankrupt system*." *United States v. Fox*, 95 U.S. 670, 672 (1878) (emphasis added). The Supreme Court later said that "[f]rom the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power." *Cont'l Ill. Nat'l Bank & Tr. Co. v. Chicago, Rock*

---

[20] Besides the line cited, *Reiman* also states: "[E]ven if a more restricted meaning be given to the expression 'subject of bankruptcies,' there is, within the scope of discretionary power possessed by [C]ongress, of choosing the means to accomplish the end, a substantial appropriation of the existing property of the debtor towards all the debts due by him." 20 F. Cas. at 497.

[21] *Klein* was reprinted in a note to *Nelson v. Carland*, 42 U.S. (1 How.) 265 (1843).

*Island & Pac. Ry. Co.*, 294 U.S. 648, 668 (1935).[22] Likewise, almost two months after

*Continental Bank* was decided, the Supreme Court refused to countenance a narrow definition of

bankruptcy, stating that "[i]t is true that the original purpose of our bankruptcy acts was the equal

distribution of the debtor's property among his creditors; and that the aim of the legislation was

to do this promptly. But, the scope of the bankruptcy power conferred upon Congress is not

necessarily limited to that which has been exercised." *Louisville Joint Stock Land Bank v.*

*Radford*, 295 U.S. 555, 587 (1935) (footnote and citations omitted). Much more recently, the

Supreme Court, in an opinion by the late Justice John Paul Stevens, stated: "The Framers would

have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain

limited respects, for more than simple adjudications of rights in the res."[23] *Cent. Va. Cmty. Coll.*

*v. Katz*, 546 U.S. 356, 370 (2006).

      Understanding that the Bankruptcy Clause is not as narrow as the UST would lead the

Court to believe, the Court now examines the history of 28 U.S.C. § 1930. That section was first

adopted as part of the very law establishing the current Bankruptcy Code in 1978, a law entitled

"An act to establish a uniform Law on the Subject of Bankruptcies." Pub. L 95-598, Title II,

§ 246(a), 92 Stat. 2671. Congress added subsection (a)(6) to 28 U.S.C. § 1930 in 1986 in an

---

[22] Although *Continental Bank* also acknowledged that the Bankruptcy Clause is not without limits, 294 U.S. at 669–70, it noted that all interpretations to that point "demonstrate[d] in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the [then] present day. And these acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed." *Id.* at 671.

[23] Justice Stevens's pronouncement is supported by the lone mention of the Bankruptcy Clause in the Federalist Papers. "The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42, at 239 (James Madison) (Clinton Rossiter ed., 1961). Because Congress's powers under the Commerce Clause are expansive, *see, e.g., McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819), this Court fails to see how UST's narrow definition is supportable.

      Even the UST's contention that quarterly fees do not "alter substantive bankruptcy law" ignores the fact that, under 11 U.S.C. § 1112(b), a party in interest can seek conversion or dismissal for cause, which includes not paying quarterly fees.

amendment to the Bankruptcy Code and related laws under title 28. Pub. L. 99-554, Title I, § 117, 100 Stat. 3095. It, therefore, seems disingenuous for the UST—an office that only exists to administer bankruptcy cases—to claim that 28 U.S.C. § 1930(a)(6) and (7) are not "Laws on the subject of Bankruptcies." Given the Supreme Court's stated liberal interpretation of the Bankruptcy Clause and Congress's explicit invocation of the Bankruptcy Clause in passing 28 U.S.C. § 1930, the quarterly fee system, and creating the UST Program, the Court holds that 28 U.S.C. § 1930, particularly subsections (a)(6) and (7), and as amended by the 2017 Amendments, are laws on the subject of bankruptcies.

2.      *28 U.S.C. § 1930 Is Uniform on Its Face*

Having established that 28 U.S.C. § 1930 is subject to the Bankruptcy Clause, the Court turns to the parties' chief disagreement: whether the 2017 Amendments to Chapter 11 quarterly fees outlined in 28 U.S.C. § 1930(a)(6) and the Judicial Conference's subsequent—but not immediate—adoption of those fees under 28 U.S.C. § 1930(a)(7) constitute a non-uniform law in violation of the Bankruptcy Clause. The Court holds that when reading subsections (a)(6) and (7) together, 28 U.S.C. § 1930 is a uniform law.

Given the flexibility of the Bankruptcy Clause, it is not so astonishing that the Supreme Court has struck down a bankruptcy law on uniformity grounds on only one occasion. In *Gibbons*, the Court considered a law that Congress adopted after a regional railroad company failed in its reorganization, a law that had certain employee protection provisions. 455 U.S. at 459–64. After determining that the law was an exercise of Congress's bankruptcy powers, *id.* at 466, the Court stated:

> By its terms, [the law] applies to only one regional bankrupt railroad. *Only* [the company's] creditors are affected by [the law's] employee protection provisions, and *only* employees of the [company] may take benefit of the arrangement. . . . [T]here are other railroads that are currently in reorganization proceedings, but

19

> these railroads are not affected by the employee protection provisions of [the law]. The conclusion is thus inevitable that [the law] is not a response either to the particular problems of major railroad bankruptcies or to any geographically isolated problem: it is a response to the problems caused by the bankruptcy of *one* railroad. The employee protection provisions of [the law] cover neither a defined class of debtors nor a particular type of problem, but a particular problem of one bankrupt railroad. Albeit on a rather grand scale, [the law] is nothing more than a private bill such as those Congress frequently enacts under its authority to spend money.

*Id.* at 470–71 (citations and footnotes omitted). The Court determined that the law was "not within the power of Congress to enact[,]" noting that "[a] law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor." *Id*. at 471 (citation omitted). The Court grounded this holding in the history before the Constitution, when states enacted private bills that provided relief to specific individual debtors. *Id*. at 472. This practice rendered uniformity impossible and was subject to abuse, leading the Court to reason that "the Bankruptcy Clause's uniformity requirement was drafted in order to prohibit Congress from enacting private bankruptcy laws." *Id*. (citation omitted). Finally, the Court held that "[t]he uniformity requirement . . . prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor. To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id*. at 473.

    Turning now to the subsection in question here, 28 U.S.C. § 1930(a)(7) provides:

> In districts that are not part of a United States trustee region as defined in section 581 of this title, the Judicial Conference of the United States *may* require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection. Such fees shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended.

(emphasis added). The Debtors argue that the use of the word "may" provides the Judicial Conference with discretion to impose different fees. Congress also used the word "shall" in the same subsection, which the Debtors argue in the Reply, citing *Anderson v. Yungkau*, 329 U.S.

482, 485 (1947), is an indication "that each is used in its usual sense—the one act being permissive, the other mandatory." (citation omitted). The UST notes that the statute also says that the Judicial Conference "may require . . . fees *equal* to those imposed" in UST districts and that a 2001 directive of the Judicial Conference required it to adopt the new fees the moment they were implemented.[24] The failure to do so, the UST argues, was *ultra vires*.

"When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932) (citations omitted); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 38, 247–51 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt."); Stephen Breyer, Making Our Democracy Work: A Judge's View 102–05 (2010) ("Although this interpretive principle [of avoiding constitutional questions] may depart from an ordinary purpose-based approach, it serves the same practical function."). Therefore, if the Court can fairly read 28 U.S.C. § 1930(a)(7) to avoid the Bankruptcy Clause, it must.[25]

Although it is true that "may" ordinarily connotes discretion, while "shall" connotes something that is mandatory, this is not always true. "May" means "have permission to[,]" but it also means "shall, must—used esp[ecially] in deeds, contracts, and statutes[.]" *May*, 2 Webster's Third New International Dictionary 1396 (1966); *see also May*, Webster's New International Dictionary 1517 (2d ed. 1934) ("Where the sense, purpose, or policy of a statute requires it, *may* as used in the statute will be construed as *must* or *shall*; otherwise *may* has its ordinary

---

[24] Given the Court's construction of the statute, it need not address the 2001 directive cited.

[25] Neither the *Buffets* court nor the *Circuit City* court mentioned the principle of avoiding constitutional questions.

permissive and discretionary force."); *May*, American Heritage Dictionary of the English Language 1086 (5th ed. 2011) (Among other things, "may" defined as: "To be obliged, as where rules of construction or legal doctrine call for a specified interpretation of a word used in a law or legal document."); *May*, Black's Law Dictionary 993 (7th ed. 1999) (At time of 28 U.S.C. § 1930(a)(7)'s adoption, then-current edition defined "may" as, among other things: "Loosely, is required to; shall; must . . . . In dozens of cases, courts have held *may* to be synonymous with *shall* or *must*, usu[ally] in an effort to effectuate legislative intent."). As for "shall," the Supreme Court has said that, "[a]s against the government, the word 'shall,' when used in statutes, is to be construed as 'may,' unless a contrary intention is manifest." *Cairo & Fulton R.R. Co. v. Hecht*, 95 U.S. 168, 170 (1877). Thus, "[w]hen drafters use *shall* and *may* correctly, the traditional rule holds—beautifully." Scalia & Garner, Reading Law § 11, 112. 28 U.S.C. § 1930(a)(7). This, however, is not such a case.

Words of obligation and their various "alternative interpretations are as old as the jurisprudence of [the Supreme] Court." *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 419 (1992) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819)). The Court, therefore, considers each of the three constructions that the text of 28 U.S.C. § 1930(a)(7) poses. First, in line with the UST's position, is the construction that the Judicial Conference "may require" fees in BA districts, but those fees must be "equal" to those in 28 U.S.C. § 1930(a)(6). This reading naturally flows from the text and contradicts the second construction, which would allow the Judicial Conference to impose fees different from those listed in 28 U.S.C. § 1930(a)(6). Although having different fees is the consequence of the Judicial Conference's late, and only prospective, implementation of fee increases until October 1, 2018, such is contrary to the text of 28 U.S.C. § 1930(a)(7), which states that the fees imposed in BA

22

districts must be equal to those imposed in districts under the UST Program. A reading that would allow the Judicial Conference to impose different fees would render the part of the statute "equal to those imposed by paragraph (6) of this subsection" a nullity, which would violate the canon of statutory construction that "every word and every provision is to be given effect[.]" Scalia & Garner, Reading Law § 26, 174; *see also Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) (Courts "generally presum[e] that statutes do not contain surplusage." [citation and internal quotation marks omitted]); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). Moreover, it would violate the *expressio unius*[26] canon because by stating that the Judicial Conference may require equal fees, Congress implied that the Judicial Conference could *not* require fees that were *not* equal. Essentially, Congress granted the Judicial Conference permission to require quarterly fees, but with a condition—equality—that, for whatever reason, the Judicial Conference did not immediately meet.

The third possible construction, which would allow the Judicial Conference to charge either equal fees or no fees, fails for the same reasons as the second: a fee of $0 is not equal. This construction also contradicts the very reason why 28 U.S.C. § 1930(a)(7) was enacted in the first place: to avoid the constitutional issue identified in *Victoria Farms*. It would be perverse to say

---

[26] *Expressio unius est exclusio alterius*, which is Latin for "the expression of one thing is the exclusion of others." The Supreme Court has noted that "the soundness of that premise is a function of timing." *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001). The Court has also said that the canon's "fallibility can be shown by contrary indications that adopting a particular . . . statute was probably not meant to signal any exclusion of its common relatives." *United States v. Vonn*, 535 U.S. 55, 65 (2002) (citations omitted).

If Congress wanted to give the Judicial Conference discretion to charge any fee, it could have done so explicitly. Whether that would be constitutional is another matter. By stating that the Judicial Conference may charge fees *equal* to those in § 1930(a)(6), however, Congress seemingly limited the bounds of what the Judicial Conference may impose in quarterly fees by delineating but one option. What leads this Court to conclude that Congress necessarily did so was that the Judicial Conference asked Congress to allow the Judicial Conference to impose "comparable" fees, *see* Report of the Proceedings of the Judicial Conference 10 (Mar. 1996), but Congress passed a law that says "equal," *see* 28 U.S.C. § 1930(a)(7), thereby undercutting any argument that Congress did not intend to limit the Judicial Conference's discretion as to the amount of quarterly fees it could impose.

that the Judicial Conference retained the discretion not to require any quarterly fees in BA districts when the purpose and policy—the manifest intent—for enacting the law was to fix an identified constitutional issue.

Therefore, the only plausible construction of 28 U.S.C. § 1930(a)(7) is the first one: the Judicial Conference may impose fees in BA districts equal to those in 28 U.S.C. § 1930(a)(6). Because no other option is plausible, it matters not that Congress used the word "may" to describe the Judicial Conference's power. Congress's grant of discretion only allows one option; therefore, the statute is mandatory, not permissive.[27]

"The [Supreme] Court's charitable interpretation of 'uniformity' encouraged Congress to pass laws that were uniform in name only." Kenneth N. Klee, Bankruptcy and the Supreme Court 126 (2008) (citation and footnote omitted). That said, this Court must observe that 28 U.S.C. § 1930(a)(7) suffers none of the flaws inherent in *Gibbons* or *Victoria Farms*, which both struck down laws that were non-uniform on their very faces by their express or implied terms. Such is simply not true here. On its face, 28 U.S.C. § 1930(a)(7) is constitutionally uniform.[28]

      3.    *The Debtors' "As-Applied" Challenge Must Fail*

Having determined that 28 U.S.C. § 1930(a)(6) and (7) are constitutional on their face, the question shifts to whether the alleged non-uniform implementation of 28 U.S.C. § 1930(a)(6)

---

[27] The *Circuit City* court highlighted the "may require" language of 28 U.S.C. § 1930(a)(7), but did not attempt to construe that phrase as modified by the phrase "fees equal to those imposed by [28 U.S.C. § 1930(a)(6)]." 2019 WL 3202203, at *2. The *Life Partners* and *Buffets* courts likewise did not attempt to construe 28 U.S.C. § 1930(a)(7) with reference to the latter phrase. The *Cranberry Growers* court, in dicta that emphasized the word "may" but not the word "equal," stated that "[t]he plain language of § 1930(a)(7) is permissive, not mandatory[.]" 930 F.3d at 856 n.51. This Court disagrees with this assessment, both as a matter of plain language and the statute's policy and purpose.

[28] It is in this manner that this Court chiefly disagrees with *Buffets* and *Circuit City*. The 2017 Amendments did not increase quarterly fees in the UST districts only and intentionally, purposely, or even accidentally omit BA districts. As soon as the higher fees imposed by the 2017 Amendments went into effect in UST districts, 28 U.S.C. § 1930(a)(7) *automatically* operated to mandate higher fees in BA districts.

in UST and BA districts renders the Debtors' quarterly fees unconstitutional as applied. The Court holds that such a challenge is not cognizable under the circumstances.

### a. The UST Cannot Violate the Bankruptcy Clause Itself

The Court first addresses an issue not raised by either party, but which could be dispositive over whether the Debtors may challenge the application of 28 U.S.C. § 1930 as to them. Because the Bankruptcy Clause is a power of Congress and not the President, the Debtors may not be able to challenge statutes validly enacted under it.

In *Gonzales v. Raich*, 545 U.S. 1, 23–33 (2005), the Supreme Court upheld Congress's ability to regulate cannabis grown for personal use that would never enter interstate commerce. Relevant here, the plaintiffs in *Raich* framed their challenge to the statute in question as unconstitutional as applied to them, but the Court analyzed whether the statute was a valid exercise of Congress's commerce powers on its face. *Id*. at 8, 15–33. The Court noted that it has "often reiterated that [w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Id*. at 23 (citations and internal quotation marks omitted).

At least one commentator has suggested that the effect of *Raich* is that "a Commerce Clause challenge cannot be 'as-applied.'" Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1279 (2010). Rosenkranz reasoned that because Congress and not the President is the subject of the Commerce Clause, the President cannot violate it, *id.* at 1277–78, and that, if Congress did violate the Constitution, it did so when it made the law. *Id.* at 1279. Rosenkranz then extended this reasoning to all of Congress's enumerated powers because they all have the same subject: Congress. *Id.* at 1281.

There is some logic to Rosenkranz's position, and Courts of Appeals have applied *Raich* in a manner similar to Rosenkranz's position. *See, e.g., United States v. Nascimento*, 491 F.3d 25, 40–43 (1st Cir. 2007) ("Refined to bare essence, *Raich* teaches that when Congress is addressing a problem that is legitimately within its purview, an inquiring court should be slow to interfere. . . . [T]he class of activity is the relevant unit of analysis and, within wide limits, it is Congress—not the courts—that decides how to define a class of activity.").

This Court does not go so far as to say that all "as-applied" challenges to statutes under Congress's enumerated powers are noncognizable. The Court reiterates, however, that both *Gibbons* and *Victoria Farms* were both decided on facial grounds. But, as Rosenkranz himself acknowledged, what makes a challenge "facial" versus "as-applied" is "muddled." 62 Stan. L. Rev. at 1273. Unlike Rosenkranz, this Court will not be so bold as to say that the executive (or the judiciary) cannot violate the Constitution by failing to enforce validly enacted laws, but the Court does understand the barest point that Rosenkranz makes as applied to this case: the UST cannot violate the Bankruptcy Clause; only Congress can. That said, the Court holds that to the extent that the Debtors have argued that the UST has violated the Bankruptcy Clause, such is not cognizable because that Clause is a part of Article I, which only applies to Congress.

> b.  The Non-Uniform Application of 28 U.S.C. § 1930(a)(6) Is Not Unlawful as to the Debtors

The Judicial Conference is comprised of the Chief Justice of the United States, the Chief Judges of the thirteen circuit Courts of Appeals, the Chief Judge of the Court of International Trade, and judges from District Courts of each geographic circuit. 28 U.S.C. § 331. The Judicial Conference has been called an "auxiliary" of the Judicial Branch. *Lifetime Cmties., Inc. v. Admin. Office of U.S. Courts (In re Fidelity Mortg. Inv'rs)*, 690 F.2d 35, 38–39 (2d Cir. 1982); *see also Mistretta v. United States*, 488 U.S. 361, 388–89 (1989). In this respect, Congress has

delegated nonadjudicatory tasks to the Judicial Branch, much as Congress has done with administrative agencies.[29]

Most bankruptcy administration work, however, has been delegated to the UST Program, which is under the purview of the Department of Justice, which in turn is a part of the Executive Branch. In light of this dichotomy, which the Debtors do not challenge, the Court must consider whether the UST has properly applied the statute. Because the Court has already held that 28 U.S.C. § 1930(a)(6) and (7) are properly understood as laws enacted under Congress's bankruptcy powers, the Court must consider the two classic as-applied challenges: (1) whether the statutes cover the class of cases presented here, and (2) whether the law, as written, is being misapplied unconstitutionally.

### i.   28 U.S.C. § 1930 Covers This Case

The first as-applied challenge is dealt with easily. In this type of challenge, the statute in question is facially valid, but a literal interpretation would include examples that would intrude on the powers of other entities, like the states. *See, e.g., Bond v. United States*, 572 U.S. 844, 856–66 (2014). In this case, however, the Debtors sought protection under Chapter 11 of the Bankruptcy Code. With Chapter 11 cases come quarterly fees. There is no reading of 28 U.S.C. § 1930 that would invade the exclusive prerogatives of other entities, so the Court must reject any argument that the Debtors are somehow outside the constitutional limits of 28 U.S.C. § 1930's reach.[30]

---

[29] The Judicial Conference is not an agency subject to the Administrative Procedure Act. *Fidelity Mortg. Inv'rs*, 690 F.2d at 38–39.

[30] This argument was not explicitly made, but for the Court to address what the Debtors' arguments are, it must figure out what they are not.

ii.    The UST Is Not Misapplying the Law

The Debtors' argument that the application of 28 U.S.C. § 1930(a)(6) is non-uniform can also be understood to contend that either the UST or the Judicial Conference is misapplying the law. Given the text of 28 U.S.C. § 1930(a)(6) and the fact that—crucially important here—the Debtors have not raised the separate claim that the increased fees should only apply to cases filed on or after January 1, 2018, it is clear that the Debtors have not alleged that the UST is misapplying the law as written. What can be inferred from all of this is that the Debtors allege that the Judicial Conference has misapplied the law. Given that the UST Program and the BA program exist in different branches with different constitutional responsibilities, there is nothing the Court can do to lower the quarterly fees the Debtors must pay.

A.    The Court Cannot Order the UST to Violate the Law

Under the United States Constitution, the President must "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3, cl. 5. This requirement applies to agencies under the purview of the President, including the UST. Under this scheme, once Congress has enacted a valid statute empowering the Executive Branch, the Executive Branch must enforce it faithfully. Because, as the Court has already held, 28 U.S.C. § 1930 is a facially constitutional statute, the UST must enforce the quarterly fee provisions within, lest they be accused of not faithfully executing Congress's valid legislation. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum," but "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb[.]" [citations omitted]).

Likewise, this Court, like all justices and judges of the United States, must take an oath to "faithfully and impartially discharge and perform all the duties incumbent upon [it] . . . under the Constitution and laws of the United States." 28 U.S.C. § 453. To order the UST to charge or accept lesser fees than those prescribed in 28 U.S.C. § 1930(a)(6) essentially would be for this Court to order the UST to disregard the Take Care Clause and the law as written. This Court cannot do so.[31] "Why otherwise does [the Constitution] direct the judges to take an oath to support it? This oath certainly applies, in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support?" *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803).

> B.    Even If the UST Were Violating 28 U.S.C. § 1930, Such Is Not Unconstitutional

Even if this Court assumed that the UST violated the statute, the Court could not then conclude that its actions were unconstitutional. The Supreme Court has said that its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority. . . . If all executive actions in excess of statutory authority were *ipso facto* unconstitutional, . . . there would have been little need . . . for our specifying unconstitutional and ultra vires conduct as separate categories." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (citations omitted). In *Dalton*, the plaintiffs sought to enjoin the Secretary of Defense and President from closing a military base pursuant to statute. *Id.* at 464.

---

[31] There is one exception to this. Under 28 U.S.C. § 1930(f)(3), this Court may "waiv[e], in accordance with Judicial Conference policy, fees prescribed under this section for[, among others, Chapter 11] debtors and creditors." To the Court's knowledge, no such policy exists.

That statute, Pub. L. 101-510, Div. B, Title XXIX, § 2901 *et seq*., 104 Stat. 1808, was passed pursuant to Congress's powers to raise and maintain the armed forces, U.S. Const. art. I, § 8, cls. 11–14, which, like the Bankruptcy Clause, are among Congress's enumerated powers.

The Court fails to see how *Dalton*'s logic does not extend to this case. Therefore, if the UST has misapplied the law—which the Debtors have not claimed, in any regard—such might warrant relief as unlawful, but would not render 28 U.S.C. § 1930(a)(6), as applied, unconstitutional.

c.    <u>The Debtors Have No Standing to Challenge Any Misapplication of the 2017 Amendments by the Judicial Conference</u>

Because the Court has held that the UST has not misapplied the law, that can only mean that the Debtors believe that the Judicial Conference has. The problem with any assertion to this effect is that the Court possesses no power to order the Judicial Conference to do anything in this case. The Debtors filed this Motion against the UST; the Judicial Conference is not a party to it. In order to rope the Judicial Conference into this case, however, the Debtors need to have standing to do so. They do not. As noted above, standing requires that a plaintiff have an "injury in fact." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted). It also required that "the injury has to be fairly . . . trace[able] to the challenged actions of the defendant, and not . . . th[e] result [of] the independent action of some third party *not before the court*." *Id.* (emphasis added; citation and internal quotation marks omitted).

The Judicial Conference is not before this Court. Any claim of injury is not rooted in the UST's actions, but rather the Judicial Conference's actions. Moreover, had the Judicial Conference implemented the quarterly fees in BA districts without any change in the UST's actions, the Debtors would have nothing to complain of under the facts alleged. In other words, the Judicial Conference's delay in implementing the fee increases and decision not to apply the

30

increases to pending cases has had no effect on the fees assessed in this case; the Debtors' quarterly fees would be the same as they are now. Therefore, there is no injury traceable to the UST's actions.[32]

In *Marbury*, Chief Justice Marshall, quoting Blackstone's Commentaries, stated that "it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." 5 U.S. (1 Cranch) at 163 (citation and internal quotation marks omitted). Having found that William Marbury had a remedy through mandamus, *id.* at 168, the Court still could not enforce it because the statute providing the Court with original jurisdiction to issue a mandamus was unconstitutional. *Id.* at 173–80. The Court invalidated the law despite the fact that James Madison did not appear or argue the case at all. *See id.* at 153–54; *cf.* footnote 11 of this Memorandum.

In an 1893 article, Harvard law professor James Bradley Thayer contended that courts "can only disregard the Act when those who have the right to make laws have not merely made a mistake, but have made a very clear one,—so clear that it is not open to rational question." James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129, 144 (1893). Thayer's point, highlighted eloquently by Justice Holmes in his *Lochner* dissent and less so in his letter to Harold Laski, is taken here. Perhaps maintaining the dual system of USTs and BAs is a mistake. There certainly have been consequences of that dual system that seem unfair to the Debtors in this case, who are paying the fees they are, while their carbon copies in Alabama and North Carolina would not. But that concern is not properly before

---

[32] It is in this respect that this Court also disagrees with *Buffets* and *Circuit City*, namely, that the actions of the UST and Judicial Conference can transform a facially valid statute into an unconstitutional one. What is telling is that both courts found the statute uniform as applied *now. See Circuit City*, 2019 WL 3202203, at *6; *Buffets*, 597 B.R. at 594. But these findings assume their conclusions. Only Congress can violate the Bankruptcy Clause, and it can only do so at the time of a statute's adoption; the UST and Judicial Conference might violate the law, but that does not invalidate the law.

this Court and, moreover, the remedy does not lie in striking down the law or forcing the UST to disregard the law as written. Whatever mistake was made is not inherent in the text of the statute. But, whatever errors the Judicial Conference may have committed, this Court, for jurisdictional reasons, cannot fix them.

In sum, the Court holds that 28 U.S.C. § 1930(a)(6) and (7) are facially valid "uniform laws on the subject of Bankruptcies." The Court also holds that any "as-applied" challenge fails as a matter of law. Therefore, the Debtors have failed to state a claim for which relief may be granted, and the Court DISMISSES the uniformity count with prejudice. *See Iqbal*, 556 U.S. at 677–79.

     D.     The Debtors' User Fee Claim Fails to Allege Legally Sufficient Facts That the Increase in Chapter 11 Quarterly Fees Is an Unconstitutional Taking

The Debtors' second claim is that the increase in Chapter 11 fees are an unconstitutional user fee.[33] Specifically, the Debtors allege in the Motion that their quarterly fees would total an amount that "may be not much less than, if not more than, the attorneys' fees for the Debtors in these sometimes very active cases." To illustrate this, the Debtors show the discrepancy between what they actually paid in quarterly fees and what they would have paid under the old scheme.[34] The UST argues that the user fees imposed are not takings.[35] The Court holds that under the facts alleged, the Debtors are not entitled to relief as a matter of law.

The Supreme Court "has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need

---

[33] The Court assumes for purposes of this Memorandum that Chapter 11 quarterly fees are user fees.

[34] *But see* part III.A of this Memorandum.

[35] The UST argues in his papers that the Debtors fail to specify what portion of the Constitution the statute violates, but as the Debtors articulated at the hearing, they only make a claim under the Takings Clause. Indeed, the Debtors' citations in their Motion only relate to the Takings Clause. Therefore, the Court only addresses the Debtors' allegation of an unconstitutional user fee as one invoking the Takings Clause.

to record invoices and billable hours to justify the cost of its services. All that we have required is that the user fee be a 'fair approximation of the cost of benefits supplied.'" *United States v. Sperry*, 493 U.S. 52, 60 (1989) (citation omitted); *cf. FCC v. Fla. Power Corp.*, 480 U.S. 245, 253 (1987) ("So long as the rates set are not confiscatory, the Fifth Amendment [Takings Clause] does not bar their imposition." [citations omitted]). The Court has also upheld a flat user fee "without regard to the actual use . . . , so long as the fee is not excessive." *Evansville– Vandenburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (citations omitted).[36]

"It is beyond dispute that . . . user fees . . . are not takings." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 615 (2013) (citation and internal quotation marks omitted). This, of course, presumes that the user fee is *reasonable*.[37] *Sperry*, 493 U.S. at 63. "[T]he challenger has the burden of proving that the fee is 'unreasonable in amount for the privilege granted.'"[38] *N.H. Motor Transp. Ass'n v. Flynn*, 751 F.2d 43, 47 (1st Cir. 1984) (Breyer, J.) (citing *Evansville–Vandenburgh*, 405 U.S. at 716); *see also Sperry*, 493 U.S. at 60.

The determination of reasonableness is a fact-intensive exercise. *See Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 98 (2d Cir. 2009) (*Selevan I*); *see also Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986) (The Supreme Court has "eschewed the development of

---

[36] Besides considering whether a fee charged "is based on some fair approximation of the use of the facilities" and "is not excessive relation to the benefits conferred," courts analyze whether the fee "discriminate[s] against interstate commerce." *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 369 (1994) (citing *Evansville– Vandenburgh*, 405 U.S. at 716–17). The final consideration—interstate commerce—is not relevant here. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

[37] In *Koontz*, Justice Alito, writing for the Court, quoted parts of the previous sentence from Justice Scalia's dissent in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 243 n.2 (2003) (Scalia, J., dissenting). Justice Scalia's footnote, in turn, cites *Sperry*, 493 U.S. at 63, which qualifies that user fees are, by definition, reasonable. Takings, it follows, are unreasonable. The UST may not escape liability simply because of the label "user fee." *Cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (The government, "by *ipse dixit*, may not transform private property into public property without compensation[.]").

[38] Even if the Court presumed that the shifting burdens applicable to objections to claims applies here, the Debtors' allegations are insufficient to shift the burden to the UST for the same reasons they fail to state a claim for relief.

any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case." [citations omitted]). The disparities the Debtors allege might support arguments that the quarterly fees are not a "fair approximation" of the benefits and are excessive.

In determining whether a fee "is based on some fair approximation of the use of the facilities," the Second Circuit has directed a court "to consider whether the . . . policy at issue reflects rational distinctions among different classes . . . , so that each user, on the whole, pays *some* approximation of [its] fair share[.]" *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 252, 259 (2d Cir. 2013) (*Selevan II*) (citations and internal quotation marks omitted). As for excessiveness, the Second Circuit has upheld a District Court's conclusion that user fees were not excessive "based on evidence regarding . . . costs and expenditures," and that "any revenues collected did not exceed proper margins[.]" *Id.* at 260 (citations omitted).

The Second Circuit, in *Selevan I*, has also admonished courts that "whether [a] fee represents a fair approximation of [a party's] use . . . [is] an inquiry that is too fact-dependent to be decided upon examination of the pleadings." *Selevan I*, 584 F.3d at 98 (citing *Nw. Airlines*, 510 U.S. at 369). Despite this admonition, this Court holds that the Debtors' legal theories underlying their claim of harm, as alleged in the Motion, are not cognizable on their own.

First, the Debtors' allegations concerning the overall percentage of Chapter 11 cases nationwide and the contributions made by Chapter 11 debtors to the UST System cannot, without more, form the basis for the Debtors' takings claim.[39] *See Connolly*, 475 U.S. at 224; *cf. Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540–45 (2005) (An inquiry into whether a law "substantially advances" government interests "is logically prior to and distinct from the question whether a

---

[39] Because the Court must ignore the facts posited by the UST, their similar arguments are unavailing for the same reasons.

regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose[,]" but is "untenable as a takings test" because it could "demand heightened means-ends review of virtually any regulation of private property.").

Second, the Debtor's contention that there is no correlation between the quarterly fees charged and the presumed amount of time the UST has spent working on the main case cannot, even read with the national statistics, form the basis for the Debtors' takings claim. Specifically, the Debtors, who also lay out the amount of quarterly fees that have been and would have been charged in 2018, allege the following:

> In these cases, . . . assuming the Debtors are able to close their cases by the end of the third quarter of 2019, US Trustee fees under the amended fee schedule would total approximately $560,000, which may be not much less than, if not more than, the attorneys' fees for the Debtors in these sometimes very active cases. At a blended rate of $350 (assuming 50% of time spent by a trial attorney at $475 per hour, which is [the Debtors' lead counsel's] rate, and 50% of time spent by an analyst at $225 per hour), that would translate to 1,600 hours. Given the volume of cases that the US Trustee oversees and the level of activity of the US Trustee in these cases, it is impossible that the US Trustee has spent even fifty percent of that time on these cases. While the fit between the fee and the benefit conferred or cost of services used need not be perfect, "the discrepancy here exceeds permissible bounds." *See* [*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86 (2d Cir. 2009)]. The fees charged to these Debtors under the amended fee structure are a "forced contribution to general government revenues . . . not reasonably related to the costs of using the courts," *Webb's Fabulous Pharmacies*, 449 U.S. at 163, an "exaction for public purposes" rather than compensation for private benefit or for services used.

The Debtors' references to *Bridgeport Steamboat* do not help them on the facts alleged. In that case, the Second Circuit held that the fees the Bridgeport Port Authority charged ferry passengers were not a fair approximation of the services provided. 567 F.3d at 88. The Court held this because "the passenger fees were supporting the entirety of the [Bridgeport Port Authority's] operating budget and that this budget was supporting some [of their] activities of no benefit to the ferry passengers[.]" *Id.* at 87. The Court, however, did not hold the fees excessive.

*Id.* at 88. It merely upheld the District Court's finding of modest damages for the passengers, nominal damages for the ferry company, and an injunction prohibiting the collection of a fee "that exceeded what was necessary to pay for benefits to the ferry passengers." *Id.* at 81, 85, 88.

What differentiates this case from *Bridgeport Steamboat* is that the fees in that case clearly went beyond what was necessary because the fees *necessarily* were covering other services. To reach this, the District Court had "to make particularized inquiries as to the various [Bridgeport Port Authority] expenditures" to determine what did and did not benefit passengers. *Id.* at 87. Here, the Debtors' more concrete allegations regarding the amount of time the trial attorneys and analysts have spent on the main case, however, are too narrow because they fly in the face of the Supreme Court's statement that the government does not "need to record invoices and billable hours to justify the cost of its services." *Sperry*, 493 U.S. at 60.[40] The UST, even as it relates to this case, consists of more than the trial attorneys and analysts.

The Court does not mean to say that neither national statistics concerning the UST nor analyses of the UST's time expended are not pertinent to this issue; both certainly are highly relevant. The Court only means to say that the user fee analysis is too fact-intensive to consider anything less than a totality of the circumstances, which needs to be alleged, and the Supreme Court has foreclosed the extremes alleged from being cognizable on their own. Nevertheless, given the authorities the Court has reviewed and discussed, the Court can, in its experience and common sense, see a plausible set of facts between—and possibly including—those extremes upon which the Debtors could ground their takings claim. *See Iqbal*, 556 U.S. at 677–79. Those

---

[40] *Webb's Fabulous Pharmacies*, which the Debtors cite, is also inapposite. There, the Supreme Court held "that under the narrow circumstances of this case—where there is a separate and distinct . . . statute authorizing a . . . fee 'for services rendered' . . .—[the government's] taking unto itself, under [other statutes], the interest earned on [an] interpleader fund while it was in the registry of the court was a taking violative of the Fifth . . . Amendment[]. *We express no view as to the constitutionality of a statute that prescribes [the] retention of interest earned, where the interest would be the only return . . . for services [the government] renders.*" 449 U.S. at 164–65 (emphasis added; citations omitted). Such simply does not comport with the facts of this matter.

hypothetical facts could include analyses related to, but better tailored than the facts posed here, without running afoul of *Sperry*, *Connolly*, and *Lingle*; however, those authorities could also provide the UST with relevant defenses.[41] Absent the extremes alleged, which on their own are foreclosed by law, the allegations are no more than "naked assertion[s] devoid of further factual enhancement." *Id.* at 678 (citation and internal quotation marks omitted).

The Court, therefore, DISMISSES the user fee claim, but without prejudice[42] to the Debtors filing an amended complaint that meets the standards laid out in Rule 8 of the Federal Rules of Civil Procedure.[43]

## IV.   CONCLUSIONS AND ORDER

The Court having considered the pleadings and related arguments at the hearing on August 14, 2019, it is hereby **ORDERED**:

(1) That the Triem LLC claim is **DISMISSED** from this action for its lack of standing;

(2) That the UST's Procedural Objection (ECF No. 725) is **OVERRULED**;

(3) That the Debtors' Motion to Determine (ECF No. 672) be deemed an Adversary Proceeding complaint;

(4) That the Clerk is **DIRECTED** to promptly open an Adversary Proceeding docket, placing ECF Nos. 672, 725, 726, 743, 773, and this Memorandum within that docket;

---

[41] The Court reiterates that "a party challenging governmental action as an unconstitutional taking bears a substantial burden." *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (citing *Sperry*, 493 U.S. at 60); *cf. Crowell*, 285 U.S. at 62 (a statute is presumptively valid and where its construction can be fairly and plausibly interpreted, courts will spare the question of its constitutionality).

[42] The decision to dismiss without prejudice to replead is supported by the admonition from the Second Circuit noted above. *See Selevan I*, 584 F.3d at 98.

[43] The Court would entertain severing the two counts to allow the Debtors to appeal the uniformity claim under FRBP 8004 and 28 U.S.C. § 158(a)(3). The Court would also entertain certifying a direct appeal of the uniformity claim to the Second Circuit under FRBP 8006 and 28 U.S.C. § 158(d)(2).

Furthermore, should the Debtors wish to plead additional counts in an amended complaint, the Debtors must seek leave of this Court to do so. Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(a)(2).

(5) That the Debtors are **DIRECTED** to pay the requisite Adversary Proceeding filing fee within seven (7) days of this Memorandum issuing;

(6) That the UST's Motion to Dismiss (ECF No. 726) is **GRANTED** with prejudice as to the uniformity claim and without prejudice as to the user fee claim;

(7) That the Debtors may replead the user fee claim in an Amended Complaint filed within twenty-one (21) days, which may include a claim of Triem LLC should it allege cognizable damages to support its standing; and

(8) That the Debtors may seek to add any new claims as additional counts to an Amended Complaint by filing a motion under Rule 15 of the Federal Rules of Civil Procedure within twenty-one (21) days.

**IT IS SO ORDERED** at Hartford, Connecticut this 28th day of August 2019.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut